IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

| | | |
|---|---|---|
| **STELLA AKPAN,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Civ. Case No. GLS 23-2810** |
| | : | |
| **HOLY CROSS HEALTH, INC.,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

## MEMORANDUM OPINION

Pending before the Court[1] is "Defendant's Motion for Summary Judgment" ("Motion") and memorandum in support thereto filed by Holy Cross Health, Inc. ("Defendant"). (ECF No. 30). Stella Akpan ("Plaintiff") filed "Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment," and Defendant filed a Reply. (ECF Nos. 31–32). Accordingly, briefing on the matter is complete. The Court finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025).

For the reasons set forth below, the Defendant's Motion is **GRANTED.**

## I.  BACKGROUND

### A. Procedural Background

On October 18, 2023, Plaintiff filed a Complaint against the Defendant alleging claims of employment discrimination on the basis of race and national origin. (ECF No. 1, "Complaint"). In the Complaint, Plaintiff advances two counts: Count I, alleging generally that Defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*, by discriminating against her on the basis of her national origin; and Count II, alleging generally that Defendant violated

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of this Court to conduct all further proceedings in this case, to include through trial, entry of final judgment, and resolution of post-judgment proceedings. (ECF No. 11).

Title VII and 42 U.S.C. § 1981 by discriminating against her based on her race (*Id.*). The Complaint alleges acts purportedly committed by the Defendant between the period of in or about early 2020 until April 15, 2022, including allegations that the Defendant failed to promote Plaintiff twice to a Medical Technologist II position and that she was unlawfully terminated. (*Id.*, pp. 2–8). Thereafter, Defendant filed an Answer. (ECF No. 18).

Scheduling Orders were entered, discovery concluded, and summary judgment-related briefing was filed. (ECF Nos. 19, 22, 23, 25, 30–32).

**B. Factual Background[2]**

1. Plaintiff's Background

Plaintiff was born in Akwa Ibom, Uyo, Nigeria. (Deposition of Stella Akpan, "Pl. Dep.," 12:3–6, JA0003). She attended school in Nigeria and obtained a B.S. degree in biochemistry from the University of Uyo in 2002. (Pl. Dep., JA0004). After obtaining her degree, Plaintiff worked at a Saint Luke's Hospital – Uyo in Nigeria as a medical laboratory technologist from 2003 until 2008; approximately five years. (Pl. Dep., JA0008–9, 32). When Plaintiff first began working at Saint Luke's Hospital, she was an unpaid intern. (Pl. Dep., JA0032). While working at Saint Luke's, Plaintiff was not licensed in medical laboratory sciences, but her B.S. degree provided the necessary qualifications for her to perform work there. (Pl. Dep., JA0008).

In 2008, Plaintiff relocated from Nigeria to the United States. (Pl. Dep., JA0009). In or about January 2017, Plaintiff applied for and was hired as an Environmental Services Aide I by Defendant at Holy Cross Hospital (the "Hospital"). (Pl. Dep., JA0011; JA0049–50). In or about March 2018, Plaintiff applied for and was hired by Defendant as a part-time Medical Technologist-

---

[2] The parties submitted a Joint Appendix. (ECF No. 33, "JA"). Defendant's submissions can be found in this range: JA 0001–98. Plaintiff's submissions can be found in this range: JA 0099–128. The Court will refer to the documents contained in the JA as, e.g., JA0001.

PRN at the Hospital. (Pl. Dep., JA0011; JA0051). Thereafter, in or about November 2019, Plaintiff applied for and was hired as a full-time Medical Technologist at the Hospital. (Pl. Dep., JA0012; JA0054).

    2.  <u>Facts Related to National Origin and Race</u>

The Hospital employs a diverse group of employees from different backgrounds, including, *inter alia*, African Americans, Southeast Asians, Muslims, and Filipinos. (Pl. Dep., JA0025–26). In her role as a Medical Technologist, Plaintiff was supervised by Sharon Barr, Manager of Automated Laboratory Services, who had made the decision to hire her to that position. (Pl. Dep., JA0012). Ms. Barr is white. (Pl. Dep. JA0023). Plaintiff was also supervised by Sarah Tadele, Supervisor of Automated Laboratory. (Pl. Dep., JA0023). Ms. Tadele is African American and Ethiopian. (*Id.*).

On or about October 9, 2021, after Plaintiff told Ms. Barr that she had applied for a Medical Technologist II position, Ms. Barr made a comment that Plaintiff's degree from Nigeria "wasn't good."[3] (Pl. Dep., JA0034). Plaintiff testified that she never heard Ms. Barr make any other derogatory remark regarding race or national origin. (Pl. Dep., JA0034–35).

In addition, Plaintiff was told by another employee that Ms. Tadele made a comment about Nigerians being too proud because there is money in Nigeria. (Pl. Dep., JA0035). However, Plaintiff did not hear Ms. Tadele make this comment. (*Id.*). The employee that heard Ms. Tadele comment on Nigerians did not tell Plaintiff the context in which Ms. Tadele's comment was made. (*Id.*). Moreover, Plaintiff has never personally heard Ms. Tadele make any derogatory remark regarding race or national origin. (Pl. Dep., JA0035–36).

---

[3] The parties in their briefing characterize Ms. Barr's comment as stating that Plaintiff's Nigerian degree "didn't count" but the deposition testimony reflects that, in response to Defendant's counsel's question, Plaintiff testified that Ms. Bar had said her degree "wasn't good." (Pl. Dep., JA0034).

No other facts related to race or national origin are in the Joint Appendix. *See* JA0001–128.

3.   Plaintiff's Medical Technologist II Application: October 2020

In or about October 2020, Defendant posted an opening for a Medical Technologist II position. (Pl. Dep., JA0030). The general duties included performing routine and specialized procedures and reviewing and approving clinical tests for the diagnosis and treatment of patients at the Hospital. (JA0078). The position requirements included minimum licensure and/or certifications in "ASCP," "AMT," or "NCA" as a Medical Technologist, with certification eligible candidates required to pass certification/qualifying examination from a credentialing agency within twelve months of employment, should they be hired. (JA0079). The position also required a B.S. in "Clinical Laboratory Technology (Medical Technology), biological, chemistry, or a related science," and "greater than five years of verifiable experience in Clinical Laboratory Setting." (*Id.*). It was Ms. Barr and Ms. Jacquiline Schaeffer-Sisk who determined what experience was required and most advantageous for the position. (Pl. Dep., JA0031; Declaration of Jacquiline Schaeffer-Sisk, "Schaeffer-Sisk, Decl.," ¶ 6, JA0074).

Plaintiff applied for the Medical Technologist II position in October 2020. (Pl. Dep., JA0030). Plaintiff had the requisite B.S. in a related science, however, while Plaintiff was certification eligible, she did not possess any clinical laboratory certificate/license at that time. (Pl. Dep., JA0006). As of the date of her deposition on June 3, 2024, Plaintiff still had not obtained any such license. (*Id.*). In addition, at the time that she applied for the position, Plaintiff only had two-and-a-half years of medical technologist experience at the Hospital, and in the United States. (Pl. Dep., JA0031). Plaintiff believed that her prior experience working at Saint Luke's Hospital gave her the additional work experience necessary to qualify her for the position. (Pl. Dep., JA0030). The first time that Plaintiff listed her work experience at Saint Luke's Hospital in Nigeria

on her resume was in her application for the Medical Technologist II position. (Pl. Dep., JA0032). Plaintiff did not list her Nigerian work experience in her previous applications for employment at the Hospital for Environmental Services Aide I, Medical Technologist-PRN, and Medical Technologist because such experience was not required for those roles. (Pl. Dep., JA0032–33).

As set forth earlier, Plaintiff further reports that when she informed Ms. Barr that she had applied for the Medical Technologist II position, Ms. Barr had told Plaintiff that her degree from Nigeria "wasn't good." (Pl. Dep., JA0034).

Ultimately, Maria Chachere was selected for the position. (Defendant's Responses to Interrogatories, "Def. Ans. to Interrog.," at No. 10, JA0118–19). Ms. Chachere is African American and was an internal candidate who worked at the Hospital. (Pl. Dep., JA0033; Schaeffer-Sisk Decl., ¶ 8, JA0074; Def. Ans. to Interrog., at No. 11, JA0119). When she was hired, Ms. Chachere had more than five years of experience working as a Medical Technologist, a B.S. in Clinical Laboratory Science, and ASCP Certification as a Medical Laboratory Scientist. (Schaeffer-Sisk Decl., ¶ 8, JA0074; JA0081–83).

4. Plaintiff's Medical Technologist II Application: October 2021

In October 2021, Defendant posted another opening for a Medical Technologist II position. (Pl. Dep., JA0033). Plaintiff again applied. (*Id.*). Ultimately, Kayc Panasuk was hired for the position. (Pl. Dep., JA0033–34; Schaeffer-Sisk Decl., ¶ 10, JA0074). Ms. Panasuk is white. (Pl. Dep., JA0034). When she was hired, Ms. Panasuk had more than six years of experience working as a Medical Technologist, a B.S. in Medical Technology, was pursuing an M.S. in Biosecurity & Biodefense, and held ASCP Certification. (Schaeffer-Sisk Decl., ¶ 10, JA0074; JA0084–85).

After her non-selection, Plaintiff remained as a full-time Medical Technologist until she was terminated on April 15, 2022. (Pl. Dep., JA0012).

At all times, Plaintiff was an at-will employee of the Defendant. (Pl. Dep., JA0012–13; JA0049–52).

5.    Other Evidence Related to Plaintiff's Medical Technologist II Applications

According to Defendant, due to the COVID-19 pandemic and the stress that the Hospital was under—which Plaintiff was aware of—it was critical that the individuals hired to the Medical Technologist II positions have the ability to work independently and with limited oversight due to the administrative constraints that Defendant had with training in the laboratory. (Pl. Dep., JA0028; Schaeffer-Sisk Decl., ¶¶ 5–6, JA0073–74). Thus, Defendant hired individuals for the Medical Technologist II positions that already had the requisite credentials and licensures as well as the educational and experiential background. (Schaeffer-Sisk Decl., ¶¶ 5–6, JA0073–74).

In addition, although not entirely clear to the Court, two emails appear to relate to Plaintiff's Medical Technologist II applications and Defendant's purported discriminatory conduct: (1) an email which purportedly was sent by Plaintiff to Veronica Rock; and (2) an email that was purportedly sent by Plaintiff to Chinyere Okonwo. (JA0101, 103).

Regarding the email to Ms. Rock, the exhibit identifies two dates that the email was purportedly sent, May 2, 2022 and November 20, 2022. (JA0101). In the email, Plaintiff appears to be complaining about her non-selection for the October 2020 Medical Technologist II position. For instance, she explains that a colleague on the evening shift (Ms. Chachere) was promoted to fill the position. (*Id.*). In addition, Plaintiff states that upon submitting her application for the Medical Technologist II position, Ms. Barr informed Plaintiff that someone named Tomas Saunar had reported that Plaintiff was not doing well and should not be promoted. (*Id.*). Plaintiff further states that Saunar had engineered an October 2020 write-up by Ms. Barr to lessen Plaintiff's chances of getting promoted, thus ensuring that his preferred candidate was promoted. Plaintiff

6

also states that Ms. Tadele advised Ms. Barr that Plaintiff should not be promoted. (*Id.*). This email does not contain any reference to Plaintiff's race or national origin. (*Id.*).

Regarding the email to Ms. Okonwo, it is similarly unclear when this email was sent as it also identifies two dates, May 2, 2022 and December 10, 2020. (JA0103). This email appears related to Plaintiff's email to Ms. Rock. (*Id.*). In the email, Plaintiff complains about: (a) Ms. Barr's treatment of Plaintiff related to her request to not pick up COVID-19 specimens; and (b) Ms. Tadele's so-called interference with Plaintiff's "hematology bench" training. (*Id.*). Plaintiff also explains that while she was working as a Medical Technologist-PRN, she asked Saunar to train her in hematology, but he declined to do so because Ms. Tadele told him that no one should train Plaintiff. (*Id.*). This email also does not contain any reference to Plaintiff's race or national origin. (*Id.*).

6.  Plaintiff's FMLA Leave, Leave of Absence Request, and Termination

Defendant has a Family Medical Leave Act ("FMLA") Policy that provides all eligible employees up to twelve weeks of FMLA leave in a twelve-month period to, *inter alia*, care for a spouse, child, or parent who has a serious health condition.[4] (JA0088–89). The policy further requires that an employee provide a completed Certification of Health Care Provider form and submit medical certifications to Defendant. (JA0091). While on leave, employees are required to, where foreseeable, keep their supervisor apprised of any changes in their leave-related circumstances. (JA0092). Notably, the policy provides that "[a]n employee who fails to report to work after the expiration of any approved leave . . . may be considered to have voluntarily resigned

---

[4] The policy broadly defines child, spouse, and parent. (JA0089). The policy defines "serious condition" as "a condition that requires inpatient care at a hospital, hospice or residential medical care facility, including any period of incapacity or any subsequent treatment in connection with such inpatient care or a condition that requires continuing care by a licensed health care provider." (*Id.*).

consistent with Holy Cross Health's policies." (JA0095). Any employee who misuses FMLA leave or uses it for unintended purposes will be subject to disciplinary action up to and including termination. (*Id.*).

On September 17, 2021, Plaintiff requested FMLA leave to care for her mother in Nigeria who needed surgery for a broken wrist. (Pl. Dep., JA0014–16; JA0056). KiYonna Pollard, a benefits specialist at the Hospital, assisted Plaintiff with her FMLA request. (Pl. Dep., JA0014). Plaintiff's FMLA leave request was approved on October 4, 2021 for the period of December 14, 2021 through March 8, 2022. (Pl. Dep., JA0016; JA0056).

On February 28, 2022, Plaintiff contacted Ms. Pollard to request non-FMLA leave to continue to care for her mother in Nigeria. (Pl. Dep., JA0017; JA0097, 105). In that email, Plaintiff stated that:

> My coverage under the Family Medical Leave Act (FMLA) will be exhausted on March 8, 2022. In that regard, I am writing to request Non-FMLA Care of Family Member leave, or to inquire what steps I need to take to request an application.
>
> I will be requesting a Non-FMLA Care of Family Member leave due to my inability to return to work as my mother's health/medical condition (terminal) continues to deteriorate and this requires my undivided attention.
>
> I will be requesting 10 weeks of leave, effective March 9, 2022 through May 17, 2022. I will return to work on May 19, 2022.

(JA0105). At that time, Ms. Pollard informed Plaintiff that she would need to request a non-FMLA leave of absence and provided Plaintiff with the necessary form to complete. (*Id.*). Ms. Pollard told Plaintiff that she must complete the form and submit it to her supervisor for review and approval. (Pl. Dep., JA0017; JA0105). In addition, Plaintiff was required to provide Ms. Pollard a medical certification related to her non-FMLA leave request. (JA0105).

Pursuant to Ms. Pollard's instructions, Plaintiff was aware that absent approval of her non-

FMLA leave request, her leave would expire on March 8, 2022. (*Id.*).

On March 1, 2022, Plaintiff submitted the completed form requesting an additional ten weeks of non-FMLA leave from March 9, 2022 until May 17, 2022. (Pl. Dep., JA0017; JA0106–07; JA0108–09). Plaintiff's request for additional non-FMLA leave was initially denied by her managers on March 2, 2022. (Schaefer-Sisk Decl., ¶¶ 13–15, JA0075; JA0109–10; Declaration of KiYonna, "Pollard Decl.," ¶ 6, JA0086). Thereafter, while Plaintiff's non-FMLA leave request was under review by the Leave and Accommodations Committee, as a practical matter, her leave ended up being extended beyond March 8, 2022, and the extension lasted until the Committee finalized its denial of Plaintiff's request on April 15, 2022. (Pollard Decl., ¶¶ 5–8, JA0086–87; Def. Ans. to Interrog., at No. 5, JA0116–17; Defendant's Responses to Plaintiff's Second Set of Interrogatories, "Def. Second Ans. to Interrog.," at Nos. 1–5, JA0124–26).

Prior to being notified of a decision on her non-FMLA leave request, there is no evidence in the record that Plaintiff followed up with the Defendant after March 2, 2022 regarding her pending non-FMLA leave request. *See* JA0001–128. In addition, despite her FMLA leave expiring on March 8, 2022, Plaintiff did not return to work in March 2022. (Pl. Dep., JA0019). Rather, she returned to the United States in or about the second week of April 2022. (*Id.*).

Upon her return to the United States in or about April 2022, Plaintiff received a letter from Ms. Barr, dated April 15, 2022, which notified her that her non-FMLA leave request to return to work on May 19, 2022 had been denied. (Pl. Dep., JA0019, JA0021; JA0057; JA0110). The April 15, 2022 letter ("April 15 Letter") also notified Plaintiff that she was terminated:

> You were on an approved continuous FML from December 14, 2021 through March 8, 2022. At this time, you have exhausted your FMLA entitlement and your extended leave approval period through April 15, 2022 and are now requesting to extend your leave indefinitely.

> We have held your job open for seventeen (17) weeks, but unfortunately, because of our business needs we cannot continue to hold open your position. Because you have now exhausted your available and/or approved leave time, and you are not able to provide a date when you will be able to return to work, it is necessary that we fill your position. Therefore, the effective date of your separation from employment with Holy Cross Health will be April 15, 2022.
>
> We are grateful for your contributions to Holy Cross Health and consider you a valuable member of our greater community. We encourage you to reapply with us for any position for which you are qualified should you be released by your physician to return to work. Please let us know if we can do anything further to assist you.

(JA0110).

Despite returning to the United States earlier in April 2022, Plaintiff waited until April 24, 2022 to contact anyone, including Ms. Barr, regarding the reasons for her termination. (JA0111). Plaintiff told Ms. Barr via email that she was confused by the April 15, 2022 letter because she had provided a return-to-work date of May 18, 2022; thus, her requested non-FMLA leave was not indefinite. (*Id.*). Ms. Barr replied to Plaintiff's email, stating that the reason Plaintiff was terminated was because she had exhausted her FMLA leave and her non-FMLA request was not approved to last until May 19, 2022.[5] (JA0111).

After her termination, Plaintiff was eligible for re-hire, but she did not re-apply for a position with Defendant.[6] (Pl. Dep., JA0021).

On August 19, 2022, Plaintiff filed an Equal Employment Opportunity Commission ("EEOC") charge with the Maryland Office of Human Rights. (JA0058).

---

[5] KiYonna Pollard testified in her declaration that: "At the time of Plaintiff's termination of employment, termination letters related to the inability to extend leave included standard language stating that the leave request was for indefinite time since it was beyond the original date of expected return." (Pollard Decl., ¶ 7, JA0087).

[6] At the time that Plaintiff was terminated on April 15, 2022, the Hospital was struggling to cover all its shifts to provide proper patient care. (Schaeffer-Sisk Decl., ¶ 13–15, JA0075). The department was over-budget for overtime and due to the ongoing shortage staffage could not approve Plaintiff's request for extended leave. (*Id.*).

7.  Other Incidents: July 2020–April 2021

In the Complaint, Plaintiff alleges additional discriminatory conduct committed by Defendant, namely: (a) a July 2020 incident involving Ms. Tadele and "wiping down" tables; (b) a July/August 2020 issue related to the handling of COVID-19 specimens; and (c) an October 9, 2020 disciplinary action taken against Plaintiff. (Complaint, pp. 2–6). Plaintiff seemingly relies upon these facts in opposing summary judgment. (ECF No. 31, "Opposition," pp. 1, 3–4). The following facts do not appear to be in dispute.

a.  *2020 Incident Related to Wiping Tables*

In or about July 2020, Plaintiff was "wiping down" worktables in the laboratory when Ms. Tadele walked up and began yelling and complaining about the manner in which Plaintiff was wiping the tables. (Pl. Dep., JA0026–27). At the time, there was a shortage of wipes at the Hospital and staff were required to reuse wipes in an effort to be more efficient in wipes usage. (Pl. Dep., JA0027). The record is devoid of an explicit mention or affirmative evidence of Plaintiff's race or national origin in connection with this incident. (JA0001–128).

b.  *August 2020 Incident Related to Handling COVID-19 Specimens*

Plaintiff contends that in or about August of 2020, she was the only employee assigned to pick up COVID-19 specimens. (Pl. Dep., JA0024–25). The record is devoid of an explicit mention or affirmative evidence of Plaintiff's race or national origin playing a role in her selection for this assignment. *See* JA0001–128. However, the record also reflects that the individuals excluded from performing this assignment were of African, South Asian, and Muslim backgrounds. (Pl. Dep., JA0025). In addition, Plaintiff is not aware of how many Nigerian employees worked for Defendant, but reports that there was at least one other Nigerian employee that she worked with. (Pl. Dep., JA0027). Ultimately, Plaintiff made an Americans with Disabilities Act reasonable

accommodation request to be excused from handling COVID-19 specimens due to her asthma. (Pl. Dep., JA0023–24). On August 11, 2020, Ms. Barr approved the reasonable accommodation request. (Pl. Dep., JA0024; JA0060–64).

### c. Written Disciplinary Action Against Plaintiff

On or about October 9, 2020, Plaintiff received a Notice of Corrective Action, dated October 1, 2020, related to a technical error that she committed regarding reporting a positive Hepatitis C result for a patient even though she had failed to receive and send out a test related to the same. (Pl. Dep. JA0014; JA0102). Plaintiff defended her actions by saying that she had been busy at the chemistry department and forgot to take the specimen from the patient. (JA0102). This was the second time that Plaintiff had been warned about failing to follow lab protocol. (*Id*.).

The record is devoid of an explicit mention or affirmative evidence of Plaintiff's race or national origin playing a role in her conduct being sanctioned. *See* JA0001–128.

### 8. Facts in Dispute

The parties dispute: (1) whether Ms. Barr contacted Plaintiff regarding her non-FMLA leave request to take an additional 10 weeks of leave, effective March 9, 2022 through May 17, 2022, with a return-to-work date of May 19, 2022; and (2) whether Plaintiff received hematology training.

### a. Plaintiff's Non-FMLA Leave Request

In her response to Plaintiff's April 24, 2022 email to her, Ms. Barr advised Plaintiff that she and Human Resources had tried to reach Plaintiff multiple times by phone about her request for additional leave, but were unsuccessful so the Defendant tried to reach Plaintiff via email. (JA0111). Plaintiff counters that at the time that Ms. Barr purportedly attempted to call her she was in Nigeria. (Pl. Dep., JA0021). In addition, Plaintiff denies receiving any emails from Ms. Barr.

(Pl. Dep., JA0045).

The record is devoid of an explicit mention or affirmative evidence of Plaintiff's race or national origin playing a role in the Defendant's decisions to take the aforementioned actions to try to reach Plaintiff. *See* JA0001–128.

### b. *Plaintiff's Requests Related to Hematology Training*

It is undisputed that in late 2020 and early 2021, there were several efforts to provide Plaintiff with hematology training. (Pl. Dep., JA0028–29). To train an individual on the hematology bench required assigning two people at the same time to hematology. (Pl. Dep., JA 0029). Plaintiff sought out training in hematology so that she could be promoted. (Pl. Dep., JA0034). In addition, Plaintiff requested and was given written hematology materials to study. (Pl. Dep., JA0029; Def. Ans. to Interrog., at No. 12, JA0119).

Ultimately, the parties dispute whether Plaintiff obtained hematology training and to what extent she received such training. According to Plaintiff, Ms. Tadele prevented Plaintiff from obtaining hematology training. (Pl. Dep., JA0029–30). Plaintiff contends that she was scheduled for training in March and April 2021, but that each time Defendant would instead train a different individual, including individuals hired after Plaintiff. (Pl. Dep., JA0046; JA0099–100). Mr. Saunar offered to train Plaintiff during the evening shift, but because Plaintiff had young children, she could not work during that shift. The Hospital could not provide training during the day shift due to staffing issues. (Pl. Dep., JA0029; Schaeffer-Sisk Decl., ¶ 11, JA0074).

Defendant counters that Plaintiff did in fact receive training on the hematology bench. (Def. Ans. to Interrog., at No. 4, JA0116). In addition, Defendant explains that the reason that a newly-hired employee was trained on hematology was to learn Defendant's procedures and practices as part of his onboarding. (Def. Ans. to Interrog., at No. 3, JA0116). The record is devoid of any

13

reference to the race or national origin of the newly-hired employee who received hematology training. *See* JA0001–128.

Moreover, according to Defendant, Plaintiff did in fact received hands-on training, but certain training sessions were canceled due to staffing shortages at the Hospital. (Def. Ans. to Interrog., at No. 12, JA0119). This was because there were multiple benches that would need coverage in the Core Laboratory and because there were not enough staff to have medical technologists covering a specific bench, Plaintiff had to be assigned to a bench in which she had experience. (*Id.*).

Finally, during the time that Plaintiff was seeking out hematology training, Ms. Barr told Plaintiff to go back home and study. (P. Dep., JA0034). On Plaintiff's 2020–2021 annual review, dated January 13, 2022, Ms. Barr commented on the Hospital's dedication to continuing Plaintiff's hematology training as soon as staffing allowed. (JA0065–66).

The record is devoid of an explicit mention or affirmative evidence of Plaintiff's race or national origin playing a role in the Defendant's decisions or actions related to the hematology training. *See* JA0001–128.

## II.    THE LAW

### A.    Summary Judgment Standard

Motions for summary judgment shall be granted only if there are no genuine issues as to any material fact, such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016).

The moving party bears the burden of showing that there is no genuine issue as to any

material fact. Fed. R. Civ. P. 56(a); *Wit Man Tom v. Hosp. Ventures, LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020). The burden can be satisfied through the submission of, e.g., deposition transcripts, answers to interrogatories, admissions, declarations, stipulations, and affidavits. *Celotex Corp.*, 477 U.S. at 323; *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984); *see also* Fed. R. Civ. P. 56(c)(1)(A).

When considering a motion for summary judgment, courts are generally only allowed to consider evidence that would be admissible at trial. *See Harvey v. Velasquez Contractor, Inc.*, Civ. No. GLS 19-1573, 2020 WL 5628976 at *2 (D. Md. Sept. 21, 2020) (explaining that "to be entitled to consideration at the summary judgment stage, the evidence supporting the facts set forth by the parties must be such as would be **admissible** in evidence" at trial (emphasis in original) (citing *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 349 (D. Md. 2011))); *see also* Fed. R. Civ. P. 56(c)(2).

The Court must construe the facts and documentary materials submitted by the parties in the light most favorable to the party opposing the motion. *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). To defeat a motion for summary judgment, the nonmoving party cannot simply rest on allegations averred in its opposition or other brief. Rather, the nonmoving party must demonstrate that specific material **facts** exist that give rise to a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 323 (emphasis added); *see also* Fed. R. Civ. P. 56(c)(1).

Summary judgment is inappropriate if sufficient evidence exists from which a reasonable jury may decide in favor of the non-movant. *Anderson*, 477 U.S. at 250. Thus, "in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility." *U.S. Equal Emp. Opportunity Comm'n v. Ecology Servs., Inc.*, 447 F. Supp.

3d 420, 437 (D. Md. 2020) (citing *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006), and then citing *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002)). However, the "mere existence of a scintilla of evidence in support of the [non-movant]" is insufficient to create an issue of material fact. *Anderson*, 477 U.S. at 248.

## B.  Title VII

Title VII prohibits employers from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

In a Title VII case, a plaintiff has two methods of proof available "to demonstrate that she suffered intentional employment discrimination: (1) the mixed motive framework or (2) the pretext framework set forth in *McDonnell Douglas Corp. v. Green*." *Foster v. Summer Vill. Cmty. Ass'n, Inc.*, 520 F. Supp. 3d 734, 741 (D. Md. 2021) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)); *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019), *as amended* (Mar. 26, 2019). Under either framework, the plaintiff "always bears the ultimate burden of persuading the court that [she] has been the victim of intentional discrimination . . . regardless of the type of evidence offered . . . in support [of her] discrimination claim (direct, circumstantial, or evidence of pretext), or [regardless of] whether she proceeds under a mixed-motive or single-motive [i.e. pretext] framework." *Foster*, 520 F. Supp. 3d at 742 (alterations in the original) (internal citations and quotations omitted).

Under the mixed-motive framework, a "plaintiff may establish a claim of discrimination by demonstrating through **direct or circumstantial evidence** that . . . discrimination motivated the employer's adverse employment decision." *Hill v. Lockheed Martin Logistics Mgt., Inc.*, 354

F.3d 277, 284 (4th Cir. 2004) (emphasis added), *overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). A plaintiff is not required to "demonstrate that the prohibited characteristic was the sole motivating factor to prevail, so long as it was a motivating factor." *Id.* Put another way, "it is sufficient to demonstrate that the employer was motivated to take the adverse employment action by both permissible and forbidden reasons." *Id.*

Under the *McDonnell Douglas* pretext framework, a plaintiff must first establish a *prima facie* case of discrimination. *Sempowich v. Tactile Sys. Tech., Inc.,* 19 F.4th 643, 649 (4th Cir. 2021). The "precise formulation" of a *prima facie* case will vary depending on different factual situations, but generally, a plaintiff is "required to show that the employer took adverse action against an employee who was qualified for employment, under circumstances which give rise to an inference of unlawful discrimination." *Hartman v. Univ. of Md. at Balt.*, Civ. No. ELH 10-2041, 2012 WL 3544730, at *13 (D. Md. Aug. 14, 2012) (further citations omitted). If a plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the defendant-employer to offer a legitimate nondiscriminatory reason for its adverse employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993); *Foster*, 520 F. Supp. 3d at 742. Once a defendant has proffered a legitimate nondiscriminatory reason, the burden shifts back to the plaintiff to prove that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Rodgers v. Eagle All.*, 586 F. Supp. 3d 398, 444 (D. Md. 2022) (internal quotation marks omitted) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

Notably, the *McDonnell Douglas* framework is a "'procedural device, designed only to establish an order of proof and production' **at trial**." *Rodgers*, 586 F. Supp. 3d at 433 (emphasis added) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 521). Thus, at the summary judgment stage, the framework is "intended to be flexible . . . designed to uncover 'circumstances which give rise

to an inference of unlawful discrimination.'" *Id.* (quoting *Burdine*, 450 U.S. at 253).

Ultimately, in order to survive summary judgment, a plaintiff "need only present a genuine issue of material fact as to one liability theory" (mixed motive or *McDonnell Douglas*), and a court need not decide whether a plaintiff's discrimination claims would similarly survive under the alternative analysis. *Foster*, 520 F. Supp. 3d at 742.

### C.  42 U.S.C. § 1981

Section 1981 provides, in relevant part, that "[a]ll persons within the Jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The phrase "'make and enforce contracts' includes . . . the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Courts have held that, as is true with Title VII, Section 1981 "prohibits, *inter alia*, discrimination in employment on the basis of race." *Weathersbee v. Balt. City Fire Dep't*, 970 F. Supp. 2d 418, 428 (D. Md. 2013) (further citations omitted).

When a plaintiff advances a Section 1981 employment discrimination claim, the elements required to establish a *prima facie* case are the same as in a Title VII discrimination claim. *Gairola v. Commonwealth of Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985).

### III.    DISCUSSION[7]

### A.  Plaintiff's Allegation that Defendant Created a Hostile Work Environment

#### 1.  The Parties' Arguments

Defendant asserts that Plaintiff cannot try to advance a hostile work environment claim at this procedural juncture because Plaintiff failed to adequately plead this theory in her Complaint, and the law does allow her to amend her Complaint via her Opposition. Alternatively, Defendant

---

[7] In conducting its analysis, the Court views all evidence in the light most favorable to Plaintiff, the nonmoving party. *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021).

contends that Plaintiff cannot prevail on a hostile work environment claim because: (a) she complains about ancillary adverse employment actions that occurred between in or about July 2020 through April 2021 which are barred by the statute of limitations related to Title VII claims; (b) Plaintiff fails to meet her burden of establishing that these ancillary incidents had any relationship to Plaintiff's race and/or national origin; and (c) even if there were evidence that the alleged adverse employment actions were related to Plaintiff's race and/or national origin, such ancillary incidents were neither severe nor pervasive. (ECF No. 30-1, "Motion," pp. 31–36; ECF No. 32, "Reply," pp. 4–5).

In opposing the Motion, Plaintiff avers that: (i) paragraph 47 of the Complaint sufficiently pleads a hostile work environment claim; (ii) the ancillary adverse employment actions are not time-barred by a Title VII statute of limitations because, under the continuing violation doctrine, these ongoing incidents taken together form the basis for her hostile work environment claim; (iii) regarding the alleged adverse employment action involving COVID-19 specimens, Plaintiff made a request that her health be accommodated, and everyone who was not Nigerian was exempted from performing this task; (iv) regarding the corrective action notice, Plaintiff claims that the timing of its issuance is suspicious—i.e., it occurred after she had applied for the Medical Technologist II position and after Ms. Barr told Plaintiff that her Nigerian degree would not have value/aid her in being selected; and (v) regarding Plaintiff's efforts to receive hematology training, Plaintiff claims that the Defendant canceled all of her scheduled trainings and instead provided training to another employee who was newly hired. (ECF No. 31, "Opposition," pp. 3–5).

2. <u>Analysis</u>

As a preliminary matter, the elements for a hostile work environment claim are: (1) unwelcome harassment; (2) that the harassment was based on protected status; (3) that the

harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) that there is some basis for imposing liability on the employer. *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207–08 (4th Cir. 2019).

Next, the Court finds that Plaintiff is correct that the Supreme Court has held that a hostile work environment claim is made up of a series of separate acts that "collectively constitute one unlawful employment practice," and that in determining whether an actionable hostile work environment claim exists courts consider all circumstances, provided that an act contributing to the claim falls within the limitation period. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 221–22 (4th Cir. 2016) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116–17 (2002)). That being said, however, the Court ultimately agrees with the Defendant that Plaintiff has not sufficiently pleaded a hostile work environment claim in her Complaint.

In this Circuit, "it is well-established that parties cannot amend their complaints through briefing." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013); *see also Horton v. Cullen,* Civ. No. GLS 22-2951, 2024 WL 4169976, at *6 (D. Md. Sept. 12, 2024); *Davis v. Mabus*, 162 F. Supp. 3d 467, 482 (D. Md. 2016).

In the Complaint, Plaintiff advances Title VII and Section 1981 claims against the Defendant in Counts I and II. (Complaint, pp. 8–9). In paragraph 47, Plaintiff alleges that "[f]rom early 2020 until the termination of her employment on April 15, 2022, Plaintiff was harassed and discriminated against by her supervisors." (*Id.*, ¶ 47). However, reviewing Counts I and II of the Complaint, the Court finds that Plaintiff uses verbiage traditionally used for disparate treatment claims.[8] For example, while Counts I and II incorporate by reference the factual allegations in

---

[8] To establish a Title VII disparate treatment a plaintiff must show: (1) membership in a protected class; (2) satisfactory work performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class. *Perkins*, 936 F. 3d at 207.

paragraph 47, the paragraphs in Counts I and II utilize language that "other similarly situated employees" not of Plaintiff's race and national origin "were not subject to the same conditions of employment," which indicates that Counts I and II sound in disparate treatment, not in a hostile work environment. (*Id.*, ¶¶ 48, 53, 57, 60). The Court further finds that nowhere in Counts I and II does Plaintiff plead any language typically associated with a hostile work environment claim, e.g., "severe or pervasive" or "abusive atmosphere." (Complaint, pp. 2–9). In sum, the Court finds that Plaintiff has not sufficiently pleaded a hostile work environment claim. Accordingly, Plaintiff cannot now amend her Complaint to advance a hostile work environment claim against the Defendant in her Opposition. *See Davis*, 162 F. Supp. 3d at 482 (declining to consider a retaliation claim that arose out of facts not pleaded in the amended complaint); *Hurst v. D.C.*, 681 F. App'x 186, 194 (4th Cir. 2017) (finding that plaintiff waived her hostile work environment claim and holding that the district court did not err in not considering such a claim because it was not properly pleaded in the complaint). Relatedly, to the extent that Plaintiff tries to assert a hostile work environment claim via the Opposition, the Court declines to permit her to amend the Complaint at this late stage. *See S. Walk at Broadlands Homeowner's Ass'n, Inc*, 713 F.3d at 184; *see also Horton*, 2024 WL 4169976, at *6.

Notwithstanding the foregoing, and assuming *arguendo* that the Complaint does actually plead a hostile work environment claim, when construing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff cannot establish a *prima facie* case of hostile work environment under Title VII as to national origin and under Title VII and Section 1981 as to race-based discrimination. This is because Plaintiff has failed to establish the third element of a hostile work environment claim: that the harassment was sufficiently severe or pervasive as to alter the conditions of her employment and create an abusive atmosphere.

In determining whether conduct is severe or pervasive, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" to determine whether the work environment is both subjectively and objectively hostile so as to be abusive. *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 407 (4th Cir. 2022) (internal quotation marks omitted) (further citation omitted); *see also Prosa v. Austin*, Civ. No. ELH 20-3015, 2022 WL 394465, at *36 (D. Md. Feb. 8, 2022). It is well-settled that teasing, rude treatment by coworkers, difference of opinion, offhanded comments, and isolated incidents will not amount to discriminatory changes in the terms and conditions of employment. *Perkins*, 936 F.3d at 207–08 (collecting cases). Indeed, as the Supreme Court has cautioned, the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Moreover, "complaints premised on nothing more than rude treatment by [coworkers], callous behavior by [one's] supervisor, or a routine difference of opinion and personality conflict . . . are not actionable." *Prosa*, 2022 WL 394465, at *36 (internal quotation marks omitted) (alterations in the original) (quoting *EEOC v. Sunbelt Rentals*, 521 F.3d 306, 315–16 (4th Cir. 2008)). Furthermore, "large temporal gaps between allegations undermine a hostile-work-environment claim." *McIver*, 42 F.4th at 408 (explaining that allegations that are remote in time relative to each other and the adverse action do not create a genuine issue of material fact).

Turning to Plaintiff's purported hostile work environment claim, even construing the facts in the light most favorable to Plaintiff, no reasonable jury could find that, taken together: the August 2020 COVID-19 specimen incident; the incident with Ms. Barr telling Plaintiff to go home

and study; the July 2020 incident with Ms. Tadele yelling about wiping the tables; and Ms. Barr's comment related to Plaintiff's 2020 Medical Technologist II application about Plaintiff's Nigerian degree could constitute severe or pervasive conduct that altered the terms or conditions of Plaintiff's employment to create an abusive atmosphere. *See Perkins*, 936 F.3d at 209 (concluding that a handful of incidents over a few years is neither frequent, physically threatening, nor humiliating). Next, a reasonable jury could only find Ms. Barr's comment regarding Plaintiff's degree to be an isolated incident, which is insufficient to establish a hostile work environment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (explaining that "the mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII" (internal quotations and citations omitted)). In sum, Plaintiff fails to meet her burden on establishing the third element of *prima facie* case of a hostile work environment claim.

Moreover, even when construing the facts in Plaintiff's favor, the record is devoid of other evidence from which a reasonable jury could conclude that the alleged conduct occurred because of Plaintiff's race or national origin. *See* JA0001–128. Thus, Plaintiff also fails to meet her burden on establishing the second element of a *prima facie* case of a hostile work environment claim.

In sum, to the extent Plaintiff attempts to pursue a hostile work environment claim against Defendant, the Court enters summary judgment in favor of Defendant on this issue.[9]

### B. Plaintiff's Failure to Promote Claims: Title VII and Section 1981

1. <u>The Parties' Arguments</u>

Defendant contends that the Court should enter summary judgment in its favor on

---

[9] Below in Section III.B.2, *infra*, the Court addresses arguments related to the alleged adverse employment actions that occurred between in or about July 2020 through April 2021 and whether they are barred by the statute of limitations related to Title VII claims.

Plaintiff's failure to promote claims for three reasons. First, Defendant asserts that any Title VII failure to promote claims that arise out of purportedly-adverse employment actions taken by the Defendant before October 23, 2021 are time-barred, because they occurred prior to 300-days before Plaintiff filed her EEOC Charge on August 19, 2022. According to the Defendant, then, the follow three alleged adverse actions are not properly before the Court: (a) Ms. Barr purportedly denying Plaintiff's accommodation request to not handle COVID-19 specimens in 2020; (b) Plaintiff's non-selection for the October 2020 Medical Technologist II position; (c) the incident with Ms. Tadele involving wiping down tables; and (d) the purported denial of hematology bench training in early 2021.[10] Put another way, "any Title VII claim that pre-dates October 23, 2021 should be dismissed as a matter of law." (Motion, pp. 20, 31–34).

Second, Defendant avers that Plaintiff has not produced direct evidence to prove race or national origin discrimination related to her failure to promote claims because Ms. Barr's comment about Plaintiff's Nigerian degree is not discriminatory on its face. Third, Defendant claims that under the *McDonnell Douglas* pretext framework Plaintiff cannot prove that Defendant's reasons for not promoting her are pretextual, because she has not produced evidence from which a reasonable jury could find that her qualifications were so plainly superior to those of the individuals hired (Ms. Chachere in 2020 and Ms. Panasuk in 2021). Put another way, Defendant

---

[10] Defendant contends that to the extent any of the alleged incidents of discrimination—the COVID-19 specimen incident, the alleged denial of hematology training for Plaintiff, and the incident related to wiping down tables—are not time-barred, none of these incidents amount to an adverse employment action that harms an identifiable term or condition of Plaintiff's employment, as is required by *Muldrow v. City of St. Louis*, 155 S. Ct. 967 (2024). (Motion, pp. 31–36). Plaintiff does not respond to Defendant's arguments in her Opposition.

As repeatedly held, *infra*, there is no evidence in the record that any of Defendant's non-time-barred actions were taken on account of race or national origin. *See* JA0001–128. And indeed, Plaintiff admits that she never witnessed nor was made aware of any xenophobic or racist remarks made by either Ms. Barr or Ms. Tadele. (Pl. Dep., JA0034–36). Thus, the Court need not determine whether any of these alleged adverse employment actions harmed a term or condition of Plaintiff's employment under *Muldrow*. Put another way, to the extent that Plaintiff is attempting to advance separate disparate treatment claims under Title VII or Section 1981 related to non-time-barred alleged ancillary adverse employment actions, summary judgment in favor of Defendant will be granted.

maintains that Plaintiff has failed to create genuine disputes of material fact from which a reasonable jury could conclude that Defendant's legitimate nondiscriminatory reasons for not promoting her were pretextual; thus, entry of summary judgment is appropriate. (Motion, pp. 19–26; Reply, pp. 5–7).

Plaintiff responds that, first, any prior acts may still be used as background evidence to support Plaintiff's other timely claims. (Opposition, p. 3).

Second, Plaintiff asserts that she has produced direct evidence of discrimination related to her failure to promote claim. According to Plaintiff, Ms. Barr's comment about her Nigerian degree reflects that Ms. Barr chose not hire Plaintiff for the Medical Technologist II position based on Ms. Barr's biased perception of Nigerian people and thus the comment is direct evidence of discrimination. In addition, Plaintiff contends that the direct evidence caselaw cited by Defendant involving comments about foreign degrees related to a tenure track professor is factually distinguishable. This is because, according to Plaintiff, the prestige of a degree matters more when hiring in academia than hiring in medicine. (Opposition, pp. 5–6).

Third, Plaintiff submits that under the *McDonnell Douglas* framework, she has produced sufficient evidence to establish that Defendant's reasons for her non-hire are pretextual. Specifically, Plaintiff contends that she was the most qualified candidate for the position but Defendant did not hire her because of her race and national origin as evidenced by the fact that: (a) Plaintiff had the requisite education, while not certified had the potential to be certified, and had more experience than the individuals that were ultimately hired; (b) Ms. Barr blocked Plaintiff's hematology bench training; (c) Ms. Barr made a comment about Plaintiff's Nigerian degree; and (d) Ms. Barr issued a Notice of Corrective Action to Plaintiff in October 2020 related to a technical error committed by Plaintiff. (Opposition, pp. 6–8).

2.  Statute of Limitations

In order to maintain an action under Title VII, a plaintiff must file an administrative charge with the EEOC within 180 days of the alleged misconduct. *See* 42 U.S.C. § 2000e-5(e)(1). This period is extended to 300 days "when state law proscribes the alleged employment practice and the charge has initially been filed with a state deferral agency." *Williams v. Giant Food Inc.*, 370 F.3d 423, 428 (4th Cir. 2004). Maryland has such a statute. *Id.* Thus, acts "which occurred more than 300 days prior to the filing of the EEOC charge may not subsequently be challenged in a Title VII suit." *Van Slyke v. Northrop Grumman Corp.,* 115 F. Supp. 2d 587, 592 (D. Md. 2000); *see also Beall v. Abbott Lab'ys,* 130 F.3d 614, 620 (4th Cir. 1997) (same).

Here, it is undisputed that Plaintiff filed her EEOC charge on August 19, 2022. (Pl. Dep., JA0022; JA0058). Three hundred days prior to August 19, 2022 is October 23, 2021. Accordingly, Plaintiff cannot pursue Title VII discrimination claims related to conduct that pre-dates October 23, 2021.[11] *See Van Slyke*, 115 F. Supp. 2d at 592. Specifically, any independent Title VII claims are time barred related to: the July 2020 incident related to wiping tables; the August 2020 incident related to handling COVID-19 specimens; the October 2020 written disciplinary action against Plaintiff; Plaintiff's non-selection for the October 2020 Medical Technologist II position; and the Defendant's purported failure to train Plaintiff on the hematology bench.

Turning to Plaintiff's Section 1981 claims, the Fourth Circuit has held that because Section 1981 "does not specify a limitations period for actions brought under that section" when such an action is brought in Maryland, the courts "look to Maryland law to borrow the limitations period

---

[11] It is well-settled that the continuing violation doctrine cannot be used to pursue discrete act claims challenging time-barred conduct. *Guessous*, 828 F.3d at 222. A failure to promote claim is a discrete act of discrimination and the continuing violation doctrine does not apply to extend the ordinary limitations period for such claims. *Williams*, 370 F.3d at 429. Ultimately, Plaintiff cannot rely on the continuing violation doctrine to preserve any non-hostile work environment claims that are time-barred by the Title VII or Section 1981 limitations period. Notwithstanding the foregoing, the Court may still consider such evidence as background evidence to the extent that it relates to Plaintiff's timely claims. *Morgan*, 536 U.S. at 102.

for the most analogous state action." *Williams*, 370 F.3d at 42 (internal quotations omitted) (quoting *Grattan v. Burnett,* 710 F.2d 160, 162–63 (4th Cir. 1983), *aff'd,* 468 U.S. 42 (1984)). Accordingly, "a complaint alleging a violation of § 1981 in Maryland must be brought within three years of the alleged misconduct." *Id.*

Here, Plaintiff filed the Complaint on October 18, 2023, alleging violations of Section 1981 on account of race. (Complaint, p. 9). Three years prior is October 18, 2020. Thus, Plaintiff is foreclosed from bringing any Section 1981 discrimination claims based on conduct that pre-dates October 18, 2020. Specifically, any independent Section 1981 claims based on the July 2020 incident related to wiping tables and the August 2020 incident related to handling COVID-19 specimens are time-barred.

Ultimately, then, Plaintiff's live failure to promote claims are: (1) her Section 1981 failure to promote claim on account of race related to her October 2020 Medical Technologist II application; and (2) her Section 1981 and Title VII failure to promote claims on account of race and national origin related to her October 2021 Medical Technologist II application. Below in Sections III.B.3 and III.B.4, *infra*, the Court analyzes whether direct evidence or evidence of pretext exists related to Plaintiff's failure to promote claims.

### 3. Direct Evidence Under the Mixed-Motive Framework

Plaintiff has failed to produce direct evidence of discrimination related to her failure to promote claims. Direct evidence of discrimination is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, 520 (4th Cir. 2006) (internal quotations omitted). Indeed, direct evidence is only the "most blatant remarks, whose intent could be nothing other than to discriminate." *Betof v. Suburban Hosp., Inc.*, Civ. No. DKC 11-1452,

2012 WL 2564781, at *6 (D. Md. June 29, 2012) (quoting *Signal v. Gonzales*, 430 F. Supp. 2d 528,541 n.5 (D.S.C. 2006)). Thus, to overcome summary judgment, "the evidence must show that the employer announced, admitted, or 'otherwise unmistakably indicated' that an impermissible consideration was a determining factor, or that discrimination can properly be assumed from the circumstances." *Id.* (quoting *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982)). Put another way, direct evidence "is evidence from which **no inference is required**." *Holley v. N.C. Dep't of Admin., N.C.*, 846 F. Supp. 2d 416, 427 (E.D.N.C. 2012) (emphasis added).

In *Rodriguez-Monguio v. Ohio State University*, 499 F. App'x 455 (6th Cir. 2012), the appellant challenged the lower court's ruling that statements associated with her national origin were not direct evidence of unlawful discrimination. The Court of Appeals for the Sixth Circuit held that a reference to the professor's degree being from a foreign country was not direct evidence of discrimination because, if believed, such a statement would not require the conclusion that unlawful discrimination was a motivating factor in the employer's alleged adverse employment action. *Id.* at 460.

Here, upon review of the entire record before the Court, the only evidence that Plaintiff relies upon is Ms. Barr's comment that Plaintiff's degree from Nigeria "wasn't good." (Pl. Dep., JA0034). The Court finds that a reasonable jury could find that Ms. Barr's comment does not reflect discriminatory animus against Plaintiff because there is no evidence or explanation in the record as to why Ms. Barr believed that Plaintiff's Nigerian degree "wasn't good." *See* JA0001–128. Certainly, as Plaintiff argues, a reasonable jury could conclude that Ms. Barr made such a comment because she harbors prejudice against Nigerian people. But to reach that conclusion, a jury would need to **infer** such prejudicial beliefs from the words that Ms. Barr said. The record does not reflect that Ms. Barr, for example, said that Plaintiff's degree from Nigeria "wasn't good

because individuals from Nigeria are not as smart or capable as individuals from the United States." Such a statement would squarely fall within what is considered direct evidence. *See Holley*, 846 F. Supp. 2d at 427 (explaining that "direct evidence would include a decisionmaker's statement that he did not promote a plaintiff due to her [protected status]").

Notably, a reasonable jury could also infer from Ms. Barr's comment that she believes that Nigerian degrees are not good because of, e.g., some belief about the quality of the Nigerian school system, unrelated to her beliefs about the inherent intelligence or capabilities of Nigerian people. Accordingly, because Ms. Barr's comment requires inferences—however reasonable—to conclude that Defendant's failure to promote Plaintiff was motivated by unlawful prejudice, Ms. Barr's comment cannot amount to the "most blatant" of remarks "whose intent could be nothing more than to discriminate" and thus is not direct evidence of discrimination. *Betof*, 2012 WL 2564781, at *6 (quoting *Signale*, 430 F. Supp. 2d at 541 n.5); *Holley*, 846 F. Supp. 2d at 427.

Finally, Plaintiff's attempt to distinguish *Rodriguez-Monguio* by asserting that the prestige of a biochemistry degree is not relevant to her qualifications for a medical technologist position whereas the prestige of a professor's degree is relevant to that professor's qualifications for a promotion is unpersuasive. Both the appellant in *Rodriguez-Monguio* and Plaintiff complain that comments about their degrees being from foreign education institutions are direct evidence of discriminatory animus that led to adverse employment action. The Court finds no meaningful difference.

Regarding *Hibschman v. Regents of University of Maryland Systems*, No. 98-1870, 2000 WL 232015 (4th Cir. Mar. 1, 2000) (unpublished opinion), and *Balinao v. Gonzales*, Civ. No. PMD 06-0254, 2007 WL 5307975, at *14 (D.S.C. Aug. 16, 2007), *aff'd sub nom.*, *Balinao v. Mukasey*, 270 F. App'x 260 (4th Cir. 2008), the Court finds these cases distinguishable because

neither case addresses the issue of what constitutes direct evidence of discrimination. *Hibschman*, 2000 WL 232015, at *1–5 (engaging in a *McDonnell Douglas* pretext analysis) *Balinao*, 2007 WL 5307975, at *7, 14 (considering whether comments about a foreign degree were severe or pervasive conduct under a hostile work environment analysis). The inapplicability of *Hibschman* and *Balinao* does not alter the Court's ruling that Plaintiff has not produced direct evidence of discrimination based on national origin.

As to Plaintiff's failure to promote claims based on race, Plaintiff points to no direct evidence that the decision was based on Plaintiff's race. *See* JA0001–128. Indeed, Plaintiff testified that Ms. Barr has not made any derogatory comments related to Plaintiff's, or any other employee's, race. (Pl. Dep., JA0034–35). Accordingly, to survive summary judgment on her failure to promote claims, Plaintiff must proceed under the *McDonnell Douglas* pretext framework.

4.  *McDonnell Douglas* Framework

To make out a *prima facie* case for a failure to promote claim, a plaintiff must prove that:

> (1) she is a member of a protected group; (2) there was a specific position for which she applied; (3) she was qualified for the position; and (4) her employer denied her promotion and/or rejected her application under circumstances giving rise to an inference of unlawful discrimination.

*Walton v. Harker*, 33 F.4th 165, 176 (4th Cir. 2022). In their summary judgment briefing, the parties do not dispute the first three elements. However, it is unclear whether the parties dispute the existence of the fourth element. *See* Motion, pp. 22–26; Opposition, pp. 6–8.

That being said, in order to "establish 'circumstances giving rise to an inference of unlawful discrimination,' the plaintiff need only offer evidence that each open position was ultimately filled by a person outside of [her] protected group." *Gbenoba v. Montgomery Cnty. Dep't. of Health and*

*Hum. Servs.*, 209 F. Supp. 2d 572, 576 (D. Md. 2002), *aff'd,* 57 F. App'x 572 (4th Cir. 2003). The Court thus analyzes this issue below.

### a. Section 1981 Failure to Promote Claim: October 2020 Medical Technologist II Application

As to Plaintiff's Section 1981 race-based failure to promote claim related to the October 2020 Medical Technologist II position, it is undisputed that the position was filled by Ms. Chachere who is African American. (Pl. Dep., JA0033; Def. Ans. to Interrog., at No. 11, JA0119). Accordingly, even after reviewing the evidence and drawing all reasonable inferences in Plaintiff's favor, Plaintiff has not established that this position was filled by a person outside of her protected group. Because, Plaintiff has not met her *prima facie* burden, summary judgment will be entered in favor of Defendant as to Plaintiff's Section 1981 race-based failure to promote claim related to her October 2020 Medical Technologist II application.

### b. Title VII and Section 1981 Failure to Promote Claims: October 2021 Medical Technologist II Application

As to Plaintiff's October 2021 Medical Technologist II application, it is undisputed that Ms. Panasuk who was ultimately hired for the position was white and not Nigerian. (Pl. Dep., JA0033–34; Def. Ans. to Interrog., at No. 11, JA0119). Accordingly, as to both her national origin and race-based failure to promote claims, Plaintiff has established that the open position was filled by a person outside of her protected class. *Gbenoba,* 209 F. Supp. 2d at 576. In short, Plaintiff has met her *prima facie* burden.

Under the second step of the *McDonnell Douglas* framework, once a plaintiff has met her *prima facie* burden, the burden of production shifts to the defendant employer who "must produce (but not prove) a legitimate, non-discriminatory reason for the adverse employment action." *Hibschman*, 2000 WL 232015 at *3 (quoting *Burdine*, 450 U.S. at 254). In doing so, a defendant

employer "must clearly set forth, through the introduction of admissible evidence" the reasons for its decision. *Burdine*, 450 U.S. at 254–55. Notably, a defendant "need not persuade the court that it was actually motivated by the proffered reasons." *Hibschman*, 2000 WL 232015 at *3 (quoting *Burdine*, 450 U.S. at 254); *see also Rodgers*, 586 F. Supp. 3d at 443. If the defendant employer carries its burden, then "the presumption raised by the *prima facie* case is rebutted." *Burdine*, 450 U.S. at 255; *St. Mary's Honor Ctr.*, 509 U.S. at 507.

Here, the Court finds that the Defendant has carried its burden by producing evidence that it selected Ms. Panasuk for the October 2021 Medical Technologist II position because it determined that Ms. Panasuk was the most qualified candidate. (Schaeffer-Sisk Decl. ¶ 10, JA0074; JA0084–85). Accordingly, the burden shifts back to Plaintiff to show, by a preponderance of the evidence, that the Defendant's stated reasons are a pretext for discrimination. *See St. Mary's Honor Ctr.*, 509 U.S. at 507; *Rodgers*, 586 F. Supp. 3d at 435.

In the failure to promote context, a plaintiff can show that a defendant's legitimate nondiscriminatory reason is pretextual using two methods, by demonstrating that: (1) "her qualifications were so plainly superior that the employer could not have preferred another candidate;" or (2) "that the actual reason relied on . . . was rather a false description of its reasoning" that was manufactured after-the-fact. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 648 n.4 (4th Cir. 2002); *see also Gbenoba*, 209 F. Supp. 2d at 577 (same). Under either method, the Court finds that Plaintiff has failed to produce evidence that creates a genuine issue of material fact from which a reasonable jury could conclude that Defendant's legitimate nondiscriminatory reasons were pretextual.

First, even when construing the evidence before the Court in Plaintiff's favor, the Court finds that Plaintiff has failed to establish that her qualifications were "plainly superior" to those of

Ms. Panasuk. A review of the record before the Court reveals that Ms. Panasuk had more than six years of experience working as a Medical Technologist, a B.S. in Medical Technology, was pursuing an M.S. in Biosecurity & Biodefense, and held ASCP Certification. (Schaeffer-Sisk Decl. ¶ 10, JA0074; JA0084–85). A review of the record before the Court also reveals that Plaintiff had a B.S. in biochemistry and none of the requisite ASCP, AMT, or NCA certifications. (Pl. Dep., JA0006). The parties dispute whether Plaintiff had the requisite years of experience as a Medical Technologist, but even assuming that Plaintiff's Nigerian work experience was sufficient, she would only have had one to two more years of experience than Ms. Panasuk, and she did not have the requisite certifications at the time that she applied for the position. (*Id.*). Accordingly, even when viewing the facts in the light most favorable to Plaintiff, no reasonable jury could conclude that Plaintiff's qualifications were so "plainly superior" to Ms. Panasuk's qualifications such that Defendant could not have preferred Ms. Panasuk over Plaintiff—given that Ms. Panasuk had all of the requisite experience **and** certifications while Plaintiff did not.

Second, Plaintiff has failed to put any admissible facts before the Court that she was not hired for the Medical Technologist II position on account of race or national origin and that the legitimate nondiscriminatory reason was manufactured after-the-fact.

As to Plaintiff's race discrimination claim, there is no admissible evidence before the Court from which a reasonable jury could conclude that Defendant acted with race-based animus or bias. *See* JA0001–128. Plaintiff points to the August 2020 incident where Plaintiff was the only individual picking up COVID-19 specimens, Ms. Barr's write-up, and Ms. Barr's comment that Plaintiff should go home and study hematology as evidence of discriminatory bias. (Pl. Dep., JA0023–24, 34). While these incidents certainly may be evidence of Ms. Barr's purported dislike of Plaintiff, or unfair treatment related thereto, Plaintiff has simply failed to produce facts from

which a reasonable jury could conclude that such treatment was taken on account of Plaintiff's race. *See Stephenson v. Panera Bread, LLC*, Civ. No. PJM 14-700, 2014 WL 2436133, at *3 (D. Md. May 29, 2014) (explaining that Title VII "does **not** protect against even arbitrary or unfair employer actions in the absence of [inter alia, animus on account of race or national origin] as the motivating factor" (emphasis in original)). Indeed, Plaintiff testified that she has never witnessed nor heard of Ms. Barr making any derogatory remarks on the basis of Plaintiff's race or any other employee's race. (Pl. Dep., JA0034–35). Accordingly, no reasonable jury could conclude that Plaintiff was not hired for the October 2021 Medical Technologist II position because of her race and that Defendant manufactured its legitimate nondiscriminatory reason to conceal its discriminatory conduct.

As to her national origin discrimination claim, Plaintiff relies upon the following evidence: (1) Ms. Barr's comment that her Nigerian degree "wasn't good;" (2) the corrective action notice that Ms. Barr issued to her eight days after Plaintiff's conduct occurred; (3), Ms. Barr's comment that Plaintiff needed to go home and study hematology; and (4) the August 2020 incident related to the COVID-19 specimens. (Pl. Dep., JA0023–24, 34).

Regarding the second, third, and fourth incidents, even when construing all of the facts of record in Plaintiff's favor, Plaintiff has failed to produce any facts from which a reasonable jury could conclude that Defendant engaged in these alleged adverse employment actions because of Plaintiff's national origin. *See Stephenson*, 2014 WL 2436133, at *3 (adverse conduct must be related to the plaintiff's protected status). Thus, no reasonable jury could conclude that these actions evidence Defendant's discriminatory animus against Plaintiff due to her national origin.

Next, although the first incident (Ms. Barr's comment) does reference Plaintiff's national

origin, even when construing the facts in Plaintiff's favor, there is no admissible evidence[12] in the record that Defendant's proffered legitimate nondiscriminatory reason was manufactured after-the-fact to conceal unlawful discriminatory animus. *See* JA0001–128. Notably, Plaintiff admits that she has never witnessed nor heard Ms. Barr make any other remark related to Plaintiff's national origin, or any other employee's national origin. (Pl. Dep., JA0034–35). Moreover, as discussed *supra*, it is undisputed that while Plaintiff was eligible to obtain certifications/licensures, Plaintiff did not—at the time that she was passed over for a promotion—have the requisite ASCP, AMT, or NCA certifications. (Pl. Dep., JA0006). Even when construing the factual record in Plaintiff's favor, the Court find that there is no testimony, there are no declarations, and there is no other admissible evidence that Defendant did not find Ms. Panasuk to be the most qualified candidate when it hired her for the Medical Technologist II position. Nor is there evidence before the Court from which a reasonable jury could find that Defendant hired Ms. Panasuk because she was not Nigerian. *See* JA0001–128. Accordingly, no reasonable jury could conclude that Plaintiff was passed over for the position because of her nationality and that Defendant manufactured its legitimate nondiscriminatory reason to conceal its discriminatory conduct.

Finally, to the extent that Plaintiff contends that Defendant's failure to provide hematology training is further evidence of its bias or discriminatory animus against her, no reasonable jury could so find. Construing the facts in Plaintiff's favor, according to Plaintiff, it was Ms. Tadele who blocked Plaintiff's hematology training.[13] (Pl. Dep., JA0029). However, even when

---

[12] To the extent that Plaintiff relies upon her own emails sent to Ms. Rock and Ms. Okonkwo—which do not mention Plaintiff's national origin or race—in which Plaintiff complains of incidents of unfair treatment from Ms. Barr, *see* JA0101, 103, such evidence is inadmissible hearsay. *See* Fed. R. Evid. 801. Therefore, the Court will not consider it in its analysis. *See Harvey*, 2020 WL 5628976, at *3 ("The law and Federal Rules of Civil Procedure make clear that evidence supporting the facts set forth by the Plaintiff to defeat a summary judgment challenge must be admissible at trial."); *see also DeWitt v. Clean Harbors Env't Servs., Inc.*, Civ. No. RDB 16-1705, 2017 WL 3116609, at *6 (D. Md. July 21, 2017) (explaining that "conclusory and hearsay evidence does not provide support sufficient to defeat a summary judgment motion").

[13] In the Opposition, Plaintiff cites to her own email sent to Ms. Okonkwo as evidence that Ms. Barr was the one who

construing the evidence of record in Plaintiff's favor, there is no evidence before the Court that Ms. Tadele was one of the decisionmakers who decided to not promote Plaintiff. (JA0001–128). Instead, a reasonably jury who analyzed the evidence could only find that Ms. Barr and Ms. Schaeffer-Sisk made the decision not to promote Plaintiff in 2021 to the Medical Technologist II position. (Schaeffer-Sisk Decl. ¶ 6, JA0074; JA0109). Thus, any evidence related to Ms. Tadele's blocking Plaintiff's hematology training is not relevant to prove discriminatory animus related to Defendant's decision not to hire Plaintiff for the Medical Technologist II position in October 2021. *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 217 (4th Cir. 2007) ("Ultimately, it is the perception of the **decisionmaker** which is relevant." (internal citation omitted) (emphasis added)).

In sum, even when construing the facts in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, no reasonable jury could find that Defendant failed to promote Plaintiff because of her race or national origin. Accordingly, summary judgment will be granted in Defendant's favor as to her Title VII and Section 1981 failure to promote claims related to her October 2021 Medical Technologist II application.

### C. Plaintiff's Wrongful Termination Claims Under Title VII and Section 1981

1. The Parties' Arguments

Defendant contends that Plaintiff cannot make out a *prima facie* case of wrongful termination and thus entry of summary judgment in its favor is appropriate for the following reasons. First,  Plaintiff failed to return to work after her FMLA leave expired; thus, Plaintiff was not meeting Defendant's legitimate performance expectations at the time of her termination. Second, Plaintiff has failed to identify a similarly situated comparator. Third, Defendant contends

---

blocked Plaintiff's hematology training. (Opposition, p. 7). However, in that email Plaintiff's states that it was Ms. Tadele, **not** Ms. Barr, who blocked Plaintiff's hematology training. (JA0103). Notwithstanding the foregoing, as held *supra* note 12, the email is inadmissible hearsay that the Court cannot consider in resolving the Motion.

that Plaintiff cannot show that its proffered legitimate nondiscriminatory reason was pretextual and that race and/or national origin were the true reasons. (Motion, pp. 26–31).

Plaintiff counters that entry of summary judgment is inappropriate for two reasons. First, she has met her *prima facie* burden because: (a) Defendant did not fill her position after she was terminated; and (b) there were other incidents of purported unfair treatment, namely, Ms. Barr's comment regarding her degree, Defendant's failure to train her on hematology, and promoting a less experienced white employee over her. Second, Plaintiff contends that she has produced evidence from which a reasonable jury could conclude that Defendant's proffered reasons for firing her are a pretext for unlawful discrimination, i.e., the termination letter. (Opposition, pp. 8–13).

In the Reply, Defendant maintains that Plaintiff has failed to establish a *prima facie* case of discrimination and has failed to produce any evidence of pretext. (Reply, pp. 8–10).

2.  Analysis

In the Opposition, Plaintiff does not advance any arguments of wrongful termination by relying upon the mixed motive framework. Thus, to establish a claim of wrongful termination under Title VII and Section 1981, Plaintiff must proceed via the *McDonnell Douglas* pretext framework.

Without deciding whether Plaintiff has established a *prima facie* case,[14] and assuming *arguendo* that she can meet her burden, Plaintiff has nonetheless failed to produce any evidence of pretext from which a reasonable jury could conclude that Defendant fired Plaintiff because of her race or national origin. Upon review of the entire record before the Court, construing all facts in Plaintiff's favor, the only evidence related to Plaintiff's termination that a jury could credit reflects that: (i) Plaintiff knew her FLMA leave would expire on March 8, 2022; (ii) Plaintiff

---

[14] Indeed, were the Court to directly decide this issue, it would find that Plaintiff has failed to meet her *prima facie* burden. *See* JA0001–128.

requested non-FMLA leave, which she knew required supervisor approval; (iii) Plaintiff's non-FMLA leave request was denied on March 2, 2022 and the denial went through the review process and was finalized on April 15, 2022; (iv) Defendant's leave policy provides that a failure to return from FMLA leave can be considered voluntary resignation; (v) Plaintiff did not return to work on March 9, 2022; and (vi) Plaintiff was thereafter terminated. (Pl. Dep., JA0017, 19; Schaefer-Sisk Decl., ¶¶ 13–15, JA0075; Pollard Decl., ¶ 5, JA0086; JA0095; JA0097; JA0105; JA0106–08; JA0109–10). In addition, there is no evidence in the record that Plaintiff ever contacted Defendant regarding her pending non-FMLA leave of absence request before her FMLA-leave expired. *See* JA0001–128.

Critically, absent from the record before the Court is any evidence that the Defendant considered Plaintiff's race or national origin in deciding to terminate her after she failed to return to work on March 9, 2022, and failed to return to work at any time thereafter, including up until the time that the denial of her non-FMLA leave request was finalized on April 15, 2022. *See* JA0001–128.

In sum, because no reasonable jury could conclude that Plaintiff was terminated due to her race or national origin, summary judgment will be entered in favor of the Defendant on Plaintiff's wrongful termination claims.

## IV.    CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment, (ECF No. 30), is **GRANTED.** The Clerk of the Court is directed to close the case.

A separate Order will follow.

Date: September 10, 2025                              _____/s/_____
                                                     The Honorable Gina L. Simms
                                                     United States Magistrate Judge